## Cardwell *vs* Sprigg's heirs.

ERROR TO THE SHELBY CIRCUIT.

*Champerty. Parol contracts. Deeds. Adverse posses-
sion. Competency of witnesses.*

JUDGE MARSHALL delivered the Opinion of the Court.

THIS case was formerly before the Court, and the opin-
ion then rendered is referred to for a general statement of
the facts and questions of law as then presented: See 7
*Dana,* 36. Upon the return of the cause to the Circuit
Court, the demise from the heirs of Abm. Owen, deceas-
ed, was stricken out of the declaration on a rule to show by
what authority the suit was prosecuted in the name of
said heirs. After which a trial was had on the demise
from Cardwell alone, who claimed title under the patent
of Abm. Owen, which was the oldest on the land, and
by deed of April 5, 1832, from the heirs of the patentee.

The defence was placed on two grounds: 1st, that by
the long continued possession of Bracket and his widow
and children, (who had, however, removed from the land
before the defendants took possession,) a conveyance
from Owen or his heirs, prior to the deed to Cardwell,
might be presumed, or their right of entry was barred; and,

2nd, That the sale and conveyance from Owen's heirs
to Cardwell, was void under the act against champerty,
in consequence of the adverse possession of the defendant
Shipman, the tenant of Sprigg's heirs.

The instructions of the Court which are applicable to
the first of these grounds having, when taken together,
placed the question on its proper basis before the jury,
and there being no ground to presume that they were mis-
taken in the law upon this branch of the case, or that
their verdict for the defendants was founded upon it, we
deem it unnecessary to make any more particular refer-
ence to it.

The case has been discussed in this Court mainly upon
the second ground of defence, in regard to which we deem
it necessary to state our opinion upon two points only.

EJECTMENT.

1bm369
105 596

Case 109.

*Oct.* 30, 1840.

The case stated.

1st ground of de-
fence.

2nd ground of de-
fence.

Instructions of
the Court appli-
cable to first
ground noticed
and approved.

CARDWELL
vs
SPRIGG'S HEIRS.

The possession of land to render a conveyance thereof champertous and void, must be "an actual adverse possession, manifested by some act or fact sufficient to indicate to others that the person claiming to be possessed had, in fact the possession."

1. We are of opinion that the possession of land which will render champertous and void a conveyance of the same land, between persons not in possession, must be an actual adverse possession, manifested by some act or fact sufficient to indicate to others, that the person claiming to have been possessed, had in fact the possession. There must be some open demonstration of actual occupancy, or at least of intended use, whereby the persons bargaining for the land may have some clue for ascertaining that it is in the adverse possession of another. This doctrine is expressly declared in the former opinion before referred to, pages 41–42, and supported by the case of *Moss, &c.* vs *Scott,* 2 *Dana* 275, and the case of *Lillard* vs *Mc Gee,* 3 *J. J. Marsh.* 552, in which last case it is said that improvement and occupation, without actual residence, is sufficient. It follows from these principles, that although a mere entry may, for some purposes, give possession, it does not, of itself, give such an actual adverse possession as will render void a sale or conveyance of the land made at any time after the entry, but while there is no person or thing on the land indicating actual possession. Some of the instructions given on motion of the defendants, are in effect, that if Shipman, whose farm adjoined the land leased to him, and which is in contest, procured the lease with a view of cultivating the leased land, (which was unenclosed) with his own farm, he is to be considered as in the actual possession, from the time he made the first actual entry, with the intention of taking possession under the lease; and that such possession, if adverse, would render the deed, if made during its continuance, champertous and void. These instructions were, in our opinion, erroneous, and being calculated to affect the verdict, the error is sufficient ground of reversal.

One of several heirs in whose name a demise had been laid in the declaration, but which had been stricken out, is a competent witness for the plaintiff in ejectment.

2. After the demise from the heirs of Owen was stricken from the declaration, the depositions of two of the heirs were taken, which conduce to prove that some time before the date of the deed to Cardwell, and as one of them, "from his best recollection," states, in the fall before, one of said heirs, who had usually acted for all, and whose acts had usually been confirmed by all, made the contract with Cardwell for the sale of said land by the

said heirs to him, and that the deed was afterwards made in good faith, to consummate said contract, which seems to have been verbal only, but which the witness thinks, from his general practice, he communicated immediately to his co-heirs. There is no evidence conducing to prove even an entry on the land by Shipman, for the purpose of taking possession, as early as the fall of 1831. And it is made a question whether, if the verbal contract for the sale of the land was made before there was any adverse possession, such a contract could be brought in aid of the deed afterwards made, in pursuance and confirmation of it, so as to support the deed, if there was an adverse possession when it was executed.

It has been repeatedly decided by this Court, and is now a settled doctrine, that a conveyance of land in adverse possession, is not void under the champerty act of 1824, if the conveyance be in pursuance of a written contract, which was itself uninfected with champerty.

A conveyance of land adversely possessed, is not champertous, if it be in compliance with a written executory contract of sale, made when it was not so adversely possessed.

It is now contended that the present case does not come within the principle on which this doctrine rests, because a verbal contract for land is not like one in writing, enforcible against the will of the party. But we do not perceive that this distinction is entitled to any weight in determining the construction or operation of the act against champerty. The verbal contract, though not enforcible, is not illegal, and is not only not void, but is recognized in law under various circumstances, as the source of rights and obligations. The act does not intend to prevent men from carrying into effect contracts made in good faith, and which are uninfected with champarty, but was made to prevent the purchase of pretended titles to land in adverse possession. The sole presumable object of such a purchase is to set on foot litigation, or at least to harrass the occupant. It was to defeat and to discourage this purpose that the act declares void the *purchase*, whether by deed, bond, or executory contract, if made while the land is in the adverse possession of another. It is not every deed, but every purchase, whether by deed, bond, or executory contract, that is made void, if the purchase is made while the land is adversely possessed. According to the tenor of the act, a purchase

may be made by deed, bond, or executory contract, and the construction which has been given to it by the doctrine above stated, is that if the purchase by executory contract is not within the operation of the statute, the subsequent consummation of the same purchase is not brought within the statute by an intervening adverse possession. In other words, the act does not interfere with the performance of such executory contracts as it does not itself denounce. If the purchase be pure in its origin, it is not rendered void by the subsequent fact. But if the *original contract of sale, whether executed or executory,* be made while the land is in adverse possession, it is declared void, and cannot, of course, furnish a support to any thing which may be attempted to be built upon it.

A conveyance of land made in conformity with an executory verbal contract of sale, is not champertous, though the land should be adversely possessed at the date of the conveyance.

A verbal contract for the sale and conveyance of land, being certainly an executory contract, which under many circumstances may be connected with and furnish support to a deed, afterwards made to carry it into effect, and which the vendor has a right, in good faith, to confirm by deed, we do not perceive why it should be considered as entitled to no effect whatever in giving operation to the act against champerty.

In other cases, Courts of law and equity, acting on principles of justice, have supported titles consummated by deeds, on the ground that those deeds were founded on a previous parol contract of sale, when without such cause or consideration, the title under the deed must have yielded to some intervening claim. Thus showing that although a verbal contract for land is not a sufficient ground for coercing a deed, it may be sufficient ground for supporting a deed made, *bona fide,* in compliance with it. And as the act against champerty looks to the original contract or purchase, and if that be pure does not condemn the act done in consummation of it, we are of opinion that the consummation of a pure verbal contract is no more condemned by the act than is the consummation of a written contract. It may be more difficult to prove the verbal contract, it may also be more difficult to show that the deed was in good faith, made in compliance with such a contract and for no other cause; but these facts being satisfactorily established, we are of

CARDWELL
*vs*
SPRIGG'S HEIRS.

opinion that if the verbal purchase is made when there is no adverse possession, the deed executed in compliance with it will not be affected by an adverse possession existing at its date. The law upon this point was certainly not fully explained to the jury, and there is considerable doubt whether from the instructions, they understood that they were to inquire into or to consider any other contract than that which was evidenced by the deed. We have, therefore, thought it necessary to state our opinion explicitly on this branch of the case. It is proper further to say, that in the present case, as the verbal contract was made, if at all, by one heir for himself and others, that contract, as regards the title of the other heirs, can only support the deed so far as the heir who made the contract had authority, express or implied, from them, or so far as his act was assented to by them before the adverse possession commenced. It is proper also to remark, that although three of the female heirs of Owen did not unite in the deed, yet as it was executed by their husbands, it operates to pass the interests of the *femes* during the coverture at least, and where there was a child of the marriage, born alive, it operates to pass the interest during the life of the husband, though the wife be dead. And that whatever be the length of the demise stated in the declaration, it is good while the interest of the lessor subsists.

The fact that the heirs of Owen were originally named as lessors of the plaintiff, does not affect their competency as witnesses, after the demise in their names was stricken out of the declaration. From that time they ceased to have any further interest in the suit, either in regard to costs or otherwise.

We are not to be understood as expressing any opinion as to the state of the possession at the date of the deed to Cardwell, or as limiting the inquiry on another trial to the state of the possession at the date of the parol contract.

For the error in the instructions above noticed, the judgment is reversed and the cause remanded for a new trial in conformity with this opinion.

## PETITION FOR A RE-HEARING.

*Dec.* 10, 1840.                    (By Mr. Sprigg.)

YOUR petioner, the undersigned, respectfully prays the Court for a re-consideration of this case.

In the outset of the opinion delivered, the Court say that " this case was formerly before the Court, and the opinion then rendered is referred to for a general statement of the facts and questions of law then presented: 7 *Dana,* 36."

The record of the case reported in 7 *Dana,* I will endeavor truly to recite. The declaration in ejectment, in that case, contained three counts: one on the demise of Wm. Cardwell; the second on the demise of Cardwell and the heirs of Abraham Owen; and the third on the demise of Owen's heirs alone.

The declaration was served on H. E. Shipman, the tenant of the land in controversy, on the 6th day of May, 1835. The heirs of Osborne Sprigg were afterwards admitted as defendants, in the room and stead of the casual ejector.

The case was tried in May, 1836. The whole effort of the plaintiffs was to show title in the heirs of Owen. They exhibited a patent from the Commonwealth of Kentucky to A. Owen, dated in 1795, for the land in controversy, and introduced two witnesses, J. L. Foree and Jacob Cardwell, who gave evidence conducing to prove that, as early as 1805 or 1806, Bracket, who then owned and lived on a tract of land adjoining to the land in question, bought the land in question from A. Owen, and paid him for it; that A. Owen was killed in the Army, in 1811; that the purchase of the land was by parol agreement; that from the time of the purchase up to the death of Bracket, he continued, without interruption, to improve and enclose the same, until he enclosed the *greater part of it;* " that after his death, H. L. Foree, his son-in-law, took possession of his home place, as his devisee, and continued the possession of the land in question un-

til about the year 1826 or 1827, then, finding no writings, he had no means of coercing title from Owen's heirs, he took his fence from around the *enclosed part* of the land in question and abandoned the same." The witness, Foree, stated that he had proposed to buy the land from J. C. Sprigg. Upon cross examination by the attorney for the defendants, these two witnesses both stated that "they had heard William Cardwell say that he had bought the land in question from the heirs of Owen, and that the suit was for his benefit."

Upon further examination by plaintiffs, Jacob Cardwell stated that in the fall of 1831, the Methodists of Shelby county wanted to make a camp ground; that he consented to the camp being made on his ground, which adjoined the land in question; that the camp was made on the land in question, or part of it; and that, whilst on the ground, William Cardwell observed that he had bought, *or was about* to buy, the land from Owen's heirs, and that he would *consent for them*; that he had been *their agent* in *attending to this land ;* that he knew of no written contract of purchase of the land by his brother William, from Owen's heirs, but the *deed which was read on a former trial.*

The undersigned chooses to state, explicitly, the testimony of these witnesses, and by what party it was brought out, to show that the plaintiffs, in their *management of the case, rejected and disclaimed that there ever had existed* any other contract of purchase between the plaintiff, Cardwell, and his co-plaintiffs, other than the deed made on the first trial, which was, by the misfortune of a juror, a mis-trial. *They exhibited no title in Cardwell, whatever.*

The defendants exhibited a patent from the Commonwealth of Kentucky, to Osborne Sprigg, for four hundred acres of land, covering the land in controversy, bearing date in 1797.

The defendants proved by Shipman, articles of agreement entered into between J. C. Sprigg and H. E. Shipman, the tenant in possession, at the commencement of the suit, dated July 9, 1831, whereby Sprigg leased the land in dispute to H. E. Shipman for three years and

nine months, and Shipman bound himself to put up a good fence on the land, and deliver to Sprigg possession of the land at the end of the term; and proved that the lessee, Shipman, owned and resided on a tract of land adjoining the land in question, at the date of the said lease, and proved *that, in the winter after the lease, he made part of the rails to enclose the land,* and *early* in April, 1832, *hauled some of them around part of the land, and laid some of the worm of the fence*; that between the middle of April, 1832, and the first of May, he commenced ploughing said land, &c.; that in September, 1831, he built a tent at the Methodist camp ground, and on the land in question. It was proved by S. Tevis, clerk of the Shelby Circuit Court, that since the institution of the suit, he saw C. L. Owen, one of the heirs of A. Owen, deceased, and he *refused to pay him any fees in this case; that C. L. Owen said the suit was for the benefit* of Cardwell, and Cardwell was to pay *all the costs; that Owen's heirs had no interest in the suit.* The defendants offered to read to the jury a certified copy of a deed from Owen's heirs to Cardwell, dated in April, 1832, which had been acknowledged by them before the Clerk of the Henry County Court, and was produced to the Clerk of the Shelby County Court for record, *May 26th,* 1832, which deed was for the land in dispute. *The plaintiffs objected* to the reading of the deed, but the Court overruled the objection and the deed was read to the jury.

The *plaintiffs* moved the Court to *exclude from the jury the deed aforesaid to Cardwell,* and all the declarations of Cardwell, as proved, which motion the Court overruled, and allowed the deed and Cardwell's declarations to go to the jury, *so far as a recovery may be sought on the demise, in his name,* to show that his title is champertous and void. And the Court instructed the jury that Cardwell's declarations *were not evidence* against Owen's heirs: See p. 14 of the original record. The Court overrulled all the instructions asked for, both by plaintiffs and defendants, and in lieu thereof, gave other instructions, the third and last of which was "that *if the jury believed, from the evidence, that Shipman did not possess himself*

*in fact, of the land in question before Cardwell's purchase, they should find for plaintiff,"* that is, for Cardwell: See p. 17, original record.

By reference to the instructions asked for by the defendants, it will appear that they never assumed any other position than the principle contained in the instruction recited above. The jury found their verdict for the defendants, which this Court set aside for the reasons stated in the reported case. The cause has again been tried, and another verdict rendered for the defendants, involving the very *same questions of fact and of law*, (so far as the defendants rely for defence on the laws against champerty,) as were involved in the " case formerly before the Court"—that is, had Shipman, the tenant of Sprigg's heirs, " manifested any act or fact indicating an actual adverse possession of the land in dispute," at the date of the deed to Cardwell.

In addition to the testimony which was given in the former case, which I have recited, the proof in the present record, as to actual possession of Shipman of the land in dispute, is this: Shipman, (not Shipman the tenant in possession,) states, as is before substantially proved, that in *the winter of* 1832, or early in the spring, H. E. Shipman, the tenant in possession of the land in question, commenced making rails and cutting ground logs, to enclose the land in controversy, (see pages 23–4 of the record,) *which timber* was cut, in part, *on the land in dispute.* He tracked *a rabit, on the snow, to a pile of rails placed on the ground. to make a fence around the land.*

It is not necessary that the defendants should contest the opinion of the Court, that a *mere entry* does not, *of itself,* give such *actual adverse possesion* as will render void a sale or conveyance of the land, made at any time after entry, " but while there is no person or thing indicating actual possession." I would, however, here seriously ask of the Court if H. E. Shipman, when he commenced in the winter or early in the Spring of 1832, to cut timber, in part on this land, and was then and there making rails to enclose it, was not *a person* on the land ? I ask further, if the ground logs. and rails then and there cut to make a fence around the land, and the *pile of rails*

CARDWELL
*vs*
SPRIGG'S HEIRS.

covered with a *winter's snow, were not things* on the land *sufficient to indicate* to all the world actual *adverse possession* of the land by Shipman? The time when those facts occurred was a question for the jury to determine; with them also, as the Court in the former case states, was wholly submitted the qustion of what was sufficient to indicate actual adverse possession. *Not one* witness *contradicts Shipman.* The jury believed him, and found their verdict for the defendants. If the jury of the *vicinage,* upon their oaths, were satisfied that these facts indicated adverse and actual possession, and that they occurred before there was any *valid contract* of purchase by Cardwell of the land in question, ought not their verdict to be respected?

The Court say there must be some open demonstration of *actual* occupancy, *or* at least of *intended use,* whereby the persons bargaining for the land may have *some clue* for ascertaining that it is in the adverse possession of another. Cardwell knew that Sprigg's patent embraced this very land. As early as the year 1806, he wrote to O. Sprigg, the patentee, proposing to purchase a part of this 400 acre tract; presenting a diagram of it and other tracts of land held under claims interfering with it, in which letter he never mentioned the patent to Owen. He afterwards purchased a part of this 400 acre tract from Sprigg's heirs, and adjoining the land in question, (and unless the Court mean that Shipman who, *in the winter or early in the Spring,* was cutting timber and making rails to enclose this land, ought to have informed Cardwell what he was doing, and with what intention he was so exercising possession of this land,) he *had a clue* equal to all other persons, whereby he could have ascertained it was in the *actual* adverse possession of Shipman.

The Court objects to the 4th instruction given to the jury, on motion of the defendants in these words: " That if, at the date of the lease of Sprigg to Shipman, he, Shipman, owned and lived on a farm adjoining the premises leased, and that he took and procured the lease from Sprigg, with a view of cultivating the same with his own farm, and as part there f, that Shipman is to be consid-

ered as in the actual possession of the premises leased, from the time he made his first *actual entry* on the same with the intention of taking possession as tenant to Sprigg, and as having right to use the same during his term." Here the instruction ends, as appears from the record. The Court adds to it: "And that such possession, if adverse, would render the deed made during its continuance champertous and void. The word *actual*, means "really in act," "not merely potential," "not purely in speculation," but some real act. In all well governed nations, says Blackstone, some notoriety of this kind has ever been held requisite in order to acquire and ascertain the property of lands. Under our own code, a deed of bargain and sale is sufficient to invest title without any further act. And, as I understand the Court in the opinion delivered by them, if Shipman had received a deed from the heirs of Sprigg, for the land in contest, he owning and residing on the adjoining tract, such deed would have been deemed an enlargement of his own tract of land on which he resided. A deed is a writing sealed and delivered by the parties. A lease is enumerated and classed among *original conveyances* by the common law, such whereby the benefit or estate is first created or arises. If in addition to the lease from persons having title by patent from the Commonwealth, and descent from the patentee—from persons from whom the plaintiff had purchased a part of the same land—from persons, one of whom was applied to by the devisees of Bracket, to purchase this same land in contest—if from such persons, in addition to his lease, Shipman also *actually entered* on the land under it, he is not in law to be considered in the *actual* possesson of the premises leased, from the time he did so *actually enter*, I confess I have erred always heretofore in my judgment of the law. Nor can I perceive well, the propriety of the distinction drawn by the Court in the case "formerly before the Court," between deeds of bargain and sale and a deed termed a lease. The court say the instruction was calculated to affect the verdict. I would ask if the giving the lease in evidence and other acts of actual possession was not the right of the defendants, and if it was erroneous to predicate in-

structions on these important facts? It was not a *mere*
entry, but an *actual* entry, upon which the instruction
was predicated.

The striking out from the declaration the demise
from the heirs of Owen, resulted from a spirit of respect-
ful obedience to the suggestions of this Court in their for-
mer opinion. Notwithstanding Cardwell had declared
that the suit was for his own benefit; that he had a deed
for it, and had attended exclusively to the institution and
preparation of the suit; notwithstanding C. L. Owen had
refused to pay the clerk of the Court the fees due him in
the case, and had declared that the *heirs of Owen* had
*no interest* in the suit, and that Cardwell was to pay all
the costs of it; although the counsel for the plaintiffs
made every effort to exclude Cardwell's declarations from
the jury, and with the deed to Cardwell in their posses-
sion and refusing to rely on it, and seeking a recovery
alone on the demise in the name of Owen's heirs; and
although the defendants, in order to show that the heirs
of Owen had no title *then,* if ever they had, to the land in
question, offered in evidence their deed to Cardwell; and
although the plaintiffs moved to exclude this deed also,
the Court, in their former opinion, decided that these
facts were not sufficient evidence of a champertous con-
tract between the plaintiffs, or that there was proof that
the vendee had authority to use the name of the vendors.
Indeed the Court said that proof of such *authority* alone
did not necessarily prove that the suit is prosecuted for the
*vendees benefit.* "Before the statute of 1824 should be
"applied to the suit, (this Court said,) the *jury should be*
"*satisfied* that the vendee is prosecuting it for his own
"benefit, with the knowledge and express sanction of the
"vendor, as nominal party. And therefore, as Cardwell
"*might have been* prosecuting this suit on the demise in
"the name of Owen's heirs, for *his own benefit,* but with-
"out either their sanction or consent, that it should be
"done for his own benefit, the Circuit Judge erred in
"*instructing the jury that if he was prosecuting the suit*
"*for his own benefit, he must fail in the action.*" The
Court proceeded further to intimate, that a bill of dis-
covery would be the most effectual mode of conclusively

establishing the facts requisite to prove that Cardwell was prosecuting the suit for his own benefit. With all due respect for the Court, I thought that the Court erred in the views and opinions thus delivered. The experience of mankind proves that an appeal to the conscience of our adversaries, is not the most effectual and satisfactory mode of conclusively establishing facts requisite to be proved, to insure success in a cause. Litigants in Courts of law are not allowed, as a general principle, to compel a discovery from each other. But the act of 1824, being designed for the benefit of the occupant, authorized *him, the better* to *enable* him to avail himself of its provisions, to compel the parties to such contracts as in the act are made champertous, to discover and reveal them; but for this act, the defendants would not have been permitted to compel a discovery, nor did they deem it necessary from the proof in the cause. All the plaintiffs knew of the deed to Cardwell, and that each of them were plaintiffs. Submitting to the suggestions of the Court, the undersigned filed his affidavit and caused a rule to be served on the plaintiff, Cardwell, to show by what authority he was prosecuting this suit in the name of Owen's heirs. He failed to answer to the rule, and the demise in their names was stricken out. Now I would ask the Court if they ought, in their former opinion, to have intimated a doubt that there was not sufficient evidence to "satisfy the jury," who rendered the verdict in that case, that Cardwell was prosecuting the suit for his own benefit, with the knowledge and sanction of the heirs of Owen? The jury were *satisfied* of the fact. The Court of Appeals was not satisfied, and by their opinion compelled the defendants to resort to a rule upon Cardwell, and the result is, that by the *act* of Cardwell in refusing to answer, the demise in the name of Owen's heirs is stricken out, and they, at least two of them, and the very persons through whom the plaintiff procured the deed, are introduced as witnesses in the present case, although liable *for all the costs which had occurred* before they ceased to appear as plaintiffs in this suit, *and without any proof that such costs have been ever paid.* If the Court had not forced the defendants to do what they had no need to do, the new de-

ponents, C. L. and J. D. Owen, could never have been admitted to give testimony in this cause. They are now introduced to prove an *executory contract* for the purchase of the land, before the deed to Cardwell was executed.

On the trial before the jury in the former case, and when they were plaintiffs, their attornies, as before *stated from the record, moved the Court to exclude the declarations of Cardwell, tending to show that he had bought the land,* and that the suit was for *his benefit.* And the Court did tell the jury that Cardwell's declarations were not evidence against them. They took a part in the suit which required the defendants to exhibit the deed they had made to Cardwell. The Court, in the opinion rendered in the former case, in substance say, that if Shipman was in the adverse *actual* possession of the land at the date of the deed to Cardwell, that conveyance, in law, was champertous and void, *unless the conveyance was only the consummation of a previous bona fide sale to Cardwell at a time when such sale was not illegal,* and it not *appearing* that the conveyance was made in execution of a valid executory contract, then the first instruction of the inferior Court was unexceptionable. The plaintiff, Cardwell, who refused to exhibit any title in himself, at the former trial, and took shelter alone under the heirs of Owen, has now taken the testimony of J. D. and C. L. Owen to prove that there was an *executory* contract in regard to this land some time before the date of the deed to him. Before proceeding to question the correctness of the opinion of the Court in this case, as to the admissibility of the depositions of C. L. and J. D. Owen, and the stating of other objections to the opinion delivered, I will again recur to the former opinion, and will venture to say that the Circuit Judge did not instruct the jury, on the first trial, "that if they believed Cardwell was prosecuting the suit for his own benefit, he *must fail in the action.*" The second instruction of the Circuit Judge in that case, I copy from the record; "that if they (the jury) believe from the evidence, that the suit has been instituted and is now prosecuted for the sole use and benefit of William Cardwell, *then* no *recovery* can be had on the demise in the name of *Owen's heirs,* and

they should find for the defendants." Third instruction : "That if they believed from the evidence, that Shipman "did not possess himself in fact of the land in question "before Cardwell's purchase, they should find for plain- "tiff." The substance of the two instructions, your petitioner respectfully suggests, is different from the interpretation given to them by the Court in their former opinion. They inculcate and enjoin upon the jury the observance of this principle of law : that if the jury believe, from the evidence, that the deed to Cardwell was executed at a time when Shipman was not in fact in possession of the land in question, then the deed is not affected with champerty, the title to Cardwell is good, and they should find for him, and that there could be no recovery on the demise in the name of Owen's heirs.

The deed being before the jury, by the act of the defendants, most assuredly *prevented a recovery in the names* of Owen's heirs. If it was made when Shipman, tenant of Sprigg's heirs, was in the actual adverse possession of the land in question, then by virtue of the second section of the act of 1824, which has been referred to, the title derived by Cardwell under it "vested in the Commonwealth and enured to the benefit of the person in possession, that is in Sprigg's heirs, without office found." This is the principle of law contained in the concluding part of the second section of the act above referred to, and if the facts existed as hypothecated by the Circuit Judge, in what *this Court say* in their former opinion, was his *first instruction* to the jury, then "the pre-existent title of Owen's heirs was *divested* and *affected*," because by virtue of the provision in the second section of the said act, the title which, by their deed, passed to Cardwell, in the very words of the statute, "shall vest in the Commonwealth, and enure to the benefit of the person in possession without office found:" See the statute, *Sess. Acts* 1823, *p.* 444.

I now most solemnly protest against that part of the opinion of the Court, (the reconsideration of which I earnestly solicit,) which asserts the principle that if, although Shipman was in the actual adverse possession of the land sued for, at the date of the deed to Cardwell, yet

if that deed was made in pursuance of a prior verbal executory contract, made when there was no such possession of the land, then the deed to Cardwell is not within the provisions of the statute against champerty.

C. L. Owen, in his deposition states, "that the land was sold to Cardwell some time previous to the execution of the deed for the same, which deed bears date, as I have ascertained by reference to the original, on file in the clerk's office. The sale was entirely satisfactory to all the parties, and ratified in good faith. James D. Owen generally transacted business for my father's estate, and to the *best* of my recollection, all the transactions he made were confirmed by the heirs." He states further, upon interrogatories propounded by Cardwell, that he could not precisely say what time elapsed between the making of the contract for the land in controversy, and the execution of the deed; to the *best* of his recollection it was made in the fall preceding the date of the deed. He states that there was no contract in writing other than that of Cardwell and James D. Owen, previous to the 5th of April, 1832. He has no recollection of any money being paid by Cardwell before the deed was made. This was his whole testimony. He does not even state the terms of the contract, if any there was. He does not say how much money was to be paid for it, when to be paid, or when the deed was to be made, or any thing else, only that I (the deponent,) am *aware* that James D. Owen, for himself and the heirs of Abm. Owen, sold the land. I am not disposed to be technical, but the word *"aware"* means "vigilant, *cautious;*" and in a case like this, I must observe that the deponent is "cautious" enough not to swear that he knew that James D. Owen, for himself and co-heirs, sold this land. He was "cautious" enough to go to the clerk's office and examine the date of the deed before his examination, and cautious enough not to swear positively that James D. Owen sold the land in the fall of 1831. He swears to the *best* of his *recollection.*

Your petitioner insists that C. L. Owen, being responsible for all the costs which had accrued before he ceased to be plaintiff in the suit, is not a competent witness.

The deposition of J. D. Owen, does not say what time elapsed between the time when he, for himself and his co-heirs, sold to William Cardwell twelve acres of land, and the execution of the deed. But from a circumstance which occurs to me, (says the deponent) some considerable time had transpired; the delay in the execution of the deed was owing only to the negligence of witness. The land was sold in good faith, and as he always informed the heirs relative to what he did concerning the estate, he *thinks* he must have informed them immediately after the sale. His father's heirs always sanctioned what he did, and it was generally understood by *all persons* who had business with the estate, that his contracts were acknowledged and confirmed by them. The deed that was made, was made to carry out and consummate the sale witness had previously made to Cardwell.

He does not state the circumstance which induces him to swear some considerable time had transpired between the sale, which he states he made, and the date of the deed. I cannot avoid here to observe, that both of these witnesses swear in the words used by the Court in their opinion delivered in the former case, using the words "the sale was made in good faith, was made to carry out and consummate the sale." When I reflect upon the management of that case, as I have in this petition before set forth from the record, amounting to a denial on their part, that they ever even made a *deed* for the land sued for, I cannot doubt but that the Court will grant me a new hearing. But I seriously ask the Court if the deposition of J. D. Owen can be read at all? It was taken in the republic of Texas, an independent foreign republic. Were the defendants bound to go out of their own country into a foreign dominion to attend to the taking of his deposition, when no dedimus had issued from the Shelby Circuit Court?

There is no power of attorney exhibited, giving J. D. Owen the authority to sell this land. A will of Abraham Owen is exhibited, wherein he appoints John Allen and James Moore his executors, and they qualified as such executors and were authorized by the will to sell his lands in Lincoln and Henry, and the tract on which he lived.

CARDWELL
*vs*
SPRIGG'S HEIRS.

This will was offered in evidence as conducing to show that A. Owen, when he made it, set up no claim to the land in question. I now avail myself of it to show that J. D. Owen had no authority to sell this land.

The Court is referred to the statute of Frauds and Perjuries; to the case of *Frowman* vs *Gordon's heirs, Litt. S. C.;* to that of *Barnes* vs *Wise,* 3 *Monroe,* 170; to that of *Love, &c.* vs *Chenault,* 3 *J. J. Mar.* 297; 3 *Mar.* 445; 7 *J. J. Mar.* 337; 1 *Mar. Domel* vs *Ellis, &c.; Smith, &c.* vs *Morrow,* 5 *Littell,* to show that every verbal contract for the transfer of land, whatever may be the consideration, is within the statute of Frauds and Perjuries, and therefore void. I refer the Court also to all the sections of the act entitled an act to revive and amend the Champerty and Maintenance law, and more effectually to secure *bona fide* occupants of land within this Commonwealth, especially the 8th, 9th, 10th, and 11th sections of the act: *See Sess. Acts,* 1823.

The Court, upon motion of defendants, instructed the jury " that, if they believed from the evidence that Bracket, Foree, and Foree's children had continued in actual possession of said land in contest more than twenty years before the commencement of this suit, claiming said land adversely to the claim of Owen and his heirs, they must find for the defendants." This instruction is very different from that which the Court say, in their opinion, was given. When, as stated by the Court, 1st, that by the long continued possession of Bracket and his widow and children, a conveyance from Owen and his heirs might be presumed prior to the deed to Cardwell, or their right of entry was barred. The object of the instruction asked for and given, was to rely upon long continued adverse possession such as would bar the plaintiffs from their right of entry, and if such possession was proved, it was immaterial to the defendants whether Bracket had a deed or not. The Court undertake, in their opinion, to presume that the verdict of the jury was not founded upon this instruction. If such is the law, as contained within the instruction, and if the facts proved justified the jury in their verdict, I do not see the propriety of this Court interposing presumptions as *to*

what "branch" of the evidence and the law of the case their verdict was founded.

It was proved by H. Foree that Bracket bought the land in 1805 or 6; that he occupied it, cultivated and enclosed the greater part of it, and so used it until his death in 1819; that during all that time he claimed it as his own; that the widow of Bracket remained on the same place about 12 or 18 months, when she removed, and he, the witness, took possession—he remained in possession until 1828 or 9; that, having obtained an act of Assembly to sell the land devised to his wife by Bracket, and not finding among Bracket's papers any title to the land in dispute, he was advised by counsel not to sell that land. In the year 1829, he removed the rails off the land and repaired the fencing on Bracket's home place with the view to put it in good order for sale. He had no claim to the land, but that his children did claim it. He proved that Owen, when about to start to the Wabash, was applied to by Bracket for a deed, and that Owen told him to have one written and he would execute it, and proved that Owen had been paid for the land; that the witness had once or twice applied to Dr. Moore, one of Owen's executors about the land; that Bracket, during his life, paid the taxes on the land; that after the interview between Bracket and Owen, he never heard Bracket say that he had or had not a deed for the land.

The undersigned will further observe, that every instruction asked for by the plaintiffs, and some of which involved the very question whether or not Bracket, during his possession of the land, was looking up to the heirs of Owen for a title, or whether Bracket and his devisees were claiming adverse to him.

J. C. SPRIGG, <em>for defendants.</em>

## ADDITIONAL OPINION,

(By Judge Marshall, in response to the petition for a re-hearing.)          *May 29, 1841.*

As to so much of the petition as relates to the opinion rendered when the case was formerly here, and to the

CARDWELL
vs
SPRIGG'S HEIRS.

facts and instructions given on the first trial, we need only remark, that with the former opinion we have now nothing to do, but to understand its principles and apply them to the present case, so far as they are applicable, and that the facts appearing on the first trial, except so far as the same facts appeared also on the second trial, are only material as illustrating the former opinion. The instructions of the Court and the finding of the jury on the last trial, must be compared with the evidence introduced on that trial, and for that evidence we can look only to the bill of exceptions then taken. With these prefatory remarks we proceed to notice the objections directly made to the opinion last delivered, of which a reconsideration is sought by the petition.

1. In regard to the effect of the long continued possession of Bracket and his heirs, claiming the land in contest under Owen, whose heirs have conveyed to the lessors of the plaintiff. We did not presume that the jury had found for the defendants on the ground of their possession; because the evidence showed that up to the fall of the year 1811, Bracket looked to Owen for a title, and before the end of twenty years from that time the possession of the land had been abandoned by those holding it under Bracket's claim, and the Court having correctly expounded the law upon these facts, which furnished no ground for presuming a deed, or for barring the entry under Owen's legal title, by lapse of time, it could not be supposed that the jury founded their verdict on either of these inferences. Besides, even if it could be said that the evidence relating to Bracket's application for a deed, in the fall of 1811, was such as to authorize the inference that he then obtained one, although the reasonable inference from that and other facts stated in the petition, is that he did not get one then or afterwards, then the case would be, that the jury might have found for the defendants on that ground. But this consideration would not render immaterial any error which the Court may have committed in relation to another ground of defence, on which the jury might also have found for the defendants. On the contrary, as they might have found either for the plaintiff or defendants, on either or both of the grounds

of defence relied on, a verdict for either party could not be supported if there was any error in the instructions of the Court by which it might, probably, have been affected.

2. In relation to the character of the adverse possession, which will bring the case within the statute against champerty, and the effect of a verbal contract made prior to the commencement of such possession,.but carried into effect in good faith, by deed made during the existence of such possession, we adhere to the opinion already expressed, and deem it necessary only to repeat, that a parol contract is not void under the statute of frauds, nor so decided by the adjudged cases in this state, but is effectual for some purposes, though an action or suit cannot be maintained upon it.

3. The instruction explaining what constitutes an actual possession, upon the inaccuracy of which, as applied to the question of an actual adverse possession which would render the deed to Cardwell champertous and void, the judgment is reversed by the opinion rendered, would be abstract if it be not understood as intimating that if such possession existed in this case, at the date of the deed, it was void, and this intimation is expressed in a subsequent instruction. The effect of the two together is such as is stated in the opinion, and for the reasons then stated, we think they were calculated to mislead, and were, therefore, a proper ground of reversal, in a case in which the jury might have found either way as to the possession.

4. It is true, as stated in the petition, that the deposition of J. D. Owen appears to have been taken in Texas, and though there seems to have been an order of Court for taking it, and the caption and certificate authenticating it state, that there was a commission for the purpose, no dedimus is contained in this record. This defect, if existing in fact, would undoubtedly have formed a valid objection to the reading of the deposition in the Circuit Court. But it does not appear that they were objected to on that ground, and in this Court the only objection urged was to the incompetency of the witness. We did not, therefore, think it necessary, and especially as the affirmance or reversal of the judgment did not depend on

CARDWELL,
vs
SPRIGG'S HEIRS.

An objection to a deposition on account of the want of a dedimus, (when a dedimus is necessary,) must be made in the Circuit Court, & cannot be availably made, for the first time, in this Court.

that deposition, to notice a defect which may have been waived, or may not, in fact, have existed. There was no exception taken by the defendants to the admission of the depositions; and the objection on the ground of competency, was noticed and decided, because if availing, it was permanent in its character, and would have rendered it unnecessary to say any thing about the effect of the verbal contract. But the objection that there was no dedimus, if it had been sustained, would not have excluded the deposition of C. L. Owen, taken in this state, upon examination by both parties, and which, of itself, though not so strongly as if taken in conjunction with the other, conduces to prove all the facts on which the question as to the effect of the verbal contract is raised and decided in the opinion.

The petition for a re-hearing is overruled.

*T. P. Wilson* for plaintiff: *Sprigg and Cates* for defendants.